NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Carroll
No. 2018-0479

EVAN GREENWALD & a.

v.

RICHARD KEATING & a.

Argued: April 18, 2019
Opinion Issued: June 25, 2019

Hinckley, Allen & Snyder, LLP, of Manchester (Christopher H.M. Carter and Jamie S. Myers on the brief, and Mr. Carter orally), for the plaintiffs.

Steiner Law Office, PLLC, of Concord (R. James Steiner on the brief), and Haughey, Philpot & Laurent, PA, of Laconia (Samantha M. Jewett orally), for defendant Barbara Keating.

Haughey, Philpot & Laurent, PA, of Laconia (Samantha M. Jewett and William Philpot, Jr. on the brief, and Ms. Jewett orally), for defendants Barry and Chrysoula Uicker.

Shaheen & Gordon, P.A., of Concord (Karyn P. Forbes and Alexander W. Campbell on the brief), and Haughey, Philpot & Laurent, PA, of Laconia (Samantha M. Jewett orally), for defendant Ellen Mulligan.

Hage Hodes, P.A., of Manchester (Douglas J. Miller and Katherine E. Hedges on the brief), and Haughey, Philpot & Laurent, PA, of Laconia (Samantha M. Jewett orally), for defendant Jill Keating.

LYNN, C.J.  This case concerns an agreement for the lease of certain property in Gilford that included certain preemptive purchase rights (the Agreement).  The plaintiffs, Evan and Kelly Greenwald, have asked us to determine the proper interpretation of the Agreement, whether it has been breached, and who may be held liable.  On cross-motions for summary judgment, the Superior Court (Ignatius, J.) ruled in favor of the defendants, Barbara Keating, Jill Keating, Ellen Mulligan, and Barry and Chrysoula Uicker.  We reverse and remand.

The following facts are drawn from the trial court's summary judgment order and from undisputed documentary evidence contained in the record.  In 1996, Richard Keating[1] and his daughter, Jill Keating, purchased property on Mink Island in Gilford as joint tenants with the right of survivorship.  In 1997, a portion of the property was subdivided and sold, with Richard and Jill retaining 2.1 acres on which Richard built a camp (the Mink Island property).  Starting in 2013, Richard and his wife Barbara (the Keatings) began renting the Mink Island property during the summer months to help offset taxes.  Barbara, however, owned no interest in the property.  On June 1, 2015, Richard employed Roche Realty to list the Mink Island property for sale.  The property was originally listed for $849,900, but the price was increased to $899,900 on June 15, 2015.  Around the same time, the plaintiffs, who had previously owned a house on Mink Island, began searching for island property on Lake Winnipesaukee to rent during the summer of 2016 with an option to purchase.  The plaintiffs were aware that the Keatings were offering the Mink Island property for rent, and Mr. Greenwald contacted Barbara to inquire about its status.  Barbara informed the Greenwalds that the Mink Island property was available to rent for the summer of 2016 and was also listed for sale.

On August 9, 2015, the plaintiffs met the Keatings and their Roche Realty agent, John Goodhue, at the Mink Island property.  During the meeting the Keatings agreed to: (1) lease the Mink Island property to the plaintiffs from July 1, 2016 through August 31, 2016, at a rate of $12,000 per month; (2) take

---

[1] Richard Keating died in February 2017.

the property off the market and provide the plaintiffs with preemptive rights to purchase the property should the Keatings decide to re-list it for sale; and (3) permit the plaintiffs to apply one month's rent toward the purchase price. That day, Goodhue drafted the Agreement reflecting those terms; it was signed by the plaintiffs, as the tenant, and the Keatings, as the landlord. Paragraph 18 of the Agreement, entitled "LEASE RENEWAL AND PURCHASE OPTION," states as follows:

    A. If property remains for lease in the summer of 2017, tenants shall be given first option to renew lease for July 1-August 31, at the established 2016 lease rate.

    B. In the event that Landlord intends to re-list property for sale, Landlord agrees to give tenant first option to purchase property prior to or after conclusion of the lease, and prior to property being listed on MLS. If a sale price is agreed upon during or after the term of this lease, landlord agrees to apply one month's rent, as specified in this lease, toward the purchase price of the property. It is agreed that any sale shall be managed by John Goodhue, realtor, as listing agent.

    C. In the event that tenant does not exercise the first option to purchase property under 18B, and the property is listed for sale on MLS, but tenant maintains an interest in the future purchase of the property as presented in writing by the tenant to the landlord, landlord agrees to offer tenant legal right of first refusal to purchase the property. Tenant shall have 4 business days upon presentation of another signed purchase and sales agreement to respond in writing, either exercising or waiving their right to first refusal.

The Agreement contains an integration clause, stating that it constitutes the entire contract and that any prior understandings or representations preceding its signing are superseded by its terms. The Agreement further states that it can be modified only by a writing signed by the plaintiffs and the Keatings. Jill's ownership interest in the property was not disclosed to the plaintiffs.[2] Richard later informed Jill of the Agreement with the plaintiffs.

During the summer of 2015, the Uickers were also looking to purchase an island camp property on Lake Winnipesaukee. They hoped to sell their property on Cow Island in Tuftonboro and purchase property closer to their

---

[2] In the summary judgment proceedings giving rise to this appeal, Jill Keating did not assert that because she, as an owner of the property, did not execute the Agreement, it was therefore not enforceable against her. Accordingly, for purposes of this appeal, we assume, as did the trial court, that the Agreement is enforceable against her.

residence in Gilford. Prior to May 2016, the Uickers told Mulligan, who is Mr. Uicker's sister and a real estate broker, that they were looking to purchase property on Lake Winnipesauke. Mulligan was aware that the Keatings might consider selling the Mink Island property, and shared this information with Mr. Uicker.

Around mid-May 2016, Mulligan spoke with Barbara about the Mink Island property. Mulligan explained that she was calling on behalf of her brother and wanted to set up a time for the Uickers to visit the property. Although Barbara told Mulligan that she and Richard were unsure about selling the Mink Island property, she agreed to the visit, which occurred on or about May 16, 2016. During their visit, Richard mentioned to Mr. Uicker the purchase rights of the plaintiffs contained in the Agreement. In a June 1, 2016 e-mail to the Keatings, Mr. Uicker requested a copy of the Agreement so that he could discuss it with a title company and formulate a procedure to avoid legal trouble. The e-mail also thanked the Keatings for working with the Uickers and working out a deal to purchase the Mink Island property.

On July 1, 2016, the plaintiffs arrived at the Mink Island property to begin their lease term. At this time, the Keatings informed the plaintiffs that they did not intend to sell the property because they wanted to keep it in the family. In a text to Barbara on July 19, 2016, the plaintiffs again expressed their interest in purchasing the property, asking if the Keatings would be interested in selling the back half of the property to reduce the tax burden on the children. Barbara, however, declined the offer.

In September 2016, the Uickers offered $750,000 to purchase the Mink Island property, which the Keatings and Jill accepted. While Mr. Uicker believed that paragraph 18B had not been triggered because the Keatings had not listed the Mink Island property for sale, he informed Mulligan of the purchase and expressed concern over the Agreement. A local real estate attorney was employed to review the Agreement; he explained that the right of first refusal was ambiguous but likely required that the Keatings list the Mink Island property for sale before the plaintiffs had any rights. During a meeting on September 6, 2016, the attorney discussed with the Keatings the possibility of providing the plaintiffs with a copy of a signed purchase and sale agreement for the Mink Island property from the Uickers and giving them four days' notice to match its terms. However, Richard emphatically declared that he would not sell the Mink Island property to the plaintiffs. When discussion arose about the possibility of a lawsuit, Richard explained that he was not concerned and said "let him sue me."

On September 9, 2016, the Uickers entered into a purchase and sale agreement with Richard and Jill. Jill also executed a power of attorney for Richard to act on her behalf regarding the Mink Island property. The power of

4

attorney was notarized by Mulligan. The parties closed on the Mink Island property on September 14 or 15.

When the plaintiffs learned of the sale of the Mink Island property to the Uickers, they filed suit: (1) requesting specific performance against the Uickers to recover the property; (2) seeking damages for breach of contract and breach of the implied covenant of good faith and fair dealing against Barbara, Richard, and Jill;[3] and (3) seeking damages against Mulligan for tortious interference with contractual relations and violation of the Consumer Protection Act. On cross-motions for summary judgment,[4] the court ruled in favor of the defendants. This appeal followed.

When reviewing a trial court's ruling on cross-motions for summary judgment, we "consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Conant v. O'Meara, 167 N.H. 644, 648 (2015) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). "We review the trial court's application of the law to the facts de novo." Id. (quotation omitted).

Central to the trial court's decision was the interpretation of the Agreement — specifically paragraphs 18B and 18C. In the trial court's view, the Agreement unambiguously required that Richard and Jill intend to list the Mink Island property for sale, not merely intend to sell it, before the plaintiffs' rights under paragraph 18B were triggered. The court also concluded that paragraph 18B was unenforceable because it did not include an essential term: the purchase price. As for the right of first refusal under paragraph 18C, the trial court concluded that this provision was triggered only if the Keatings accepted an offer to purchase made by a third party after the Keatings had listed the property for sale. Thus, the trial court ruled that no breach occurred because the triggering condition — listing the property for sale — was never met.

---

[3] Although not originally named as a defendant in the plaintiffs' lawsuit, Jill Keating was later added as a defendant on the breach of contract and breach of the implied covenant of good faith and fair dealing claims.

[4] The trial court noted that Barbara and Richard did not file an answer, but instead simply moved for summary judgment. It is unclear from the record whether the other defendants followed this same procedural avenue to litigate the claims against them. Because the record provided to us does not reflect that the trial court raised any questions as to the propriety of failing to file an answer, we likewise have no occasion to consider this matter on appeal.

Like any contract, we interpret the Agreement in accordance with the general rules and principles of contract law. See LaPonsie v. Kumorek, 122 N.H. 1021, 1022 (1982). "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for this court to decide." Birch Broad. v. Capitol Broad. Corp., 161 N.H. 192, 196 (2010). "The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." Id. (quotation omitted). We review the trial court's interpretation of the Agreement de novo. See id.

The trial court determined that the language used in paragraph 18B created a condition precedent that was triggered only if the Keatings intended to list the property for sale. Conditions precedent are not favored in the law, and we will not construe contracts to include them unless required by the plain language of the agreement in question. See Holden Eng'g and Surveying v. Pembroke Rd. Realty Trust, 137 N.H. 393, 396 (1993). "As a rule of thumb, provisions which commence with words such as 'if,' 'on condition that,' 'subject to' and 'provided' create conditions precedent." Id. (quotation omitted). Although we agree with the trial court that the phrase "[i]n the event that" as used in paragraph 18B created a condition precedent, we do not agree that the paragraph unambiguously means that the triggering event comes into play only if the Keatings intended not merely to sell the property, but to sell it in a particular way — by listing it for sale to the public generally.

Relying on Roy v. George W. Greene, Inc., 533 N.E.2d 1323 (Mass. 1989), the trial court concluded that "the option to purchase [under paragraph 18B] cannot be triggered by the Keatings' intent to sell because the Keatings must have an acceptable offer to intend to sell the property." But Roy dealt with a right of first refusal. See Roy, 533 N.E.2d at 1324. A third party offer is necessary to trigger a right of first refusal because it "'refer[s] to a right that arises only after the owner has received an enforceable offer to buy.'" LeBaron v. Wight, 156 N.H. 583, 585 (2007) (quoting Roy, 533 N.E.2d at 1325). Here, it is paragraph 18C, not paragraph 18B, that explicitly deals with the right of first refusal. As the trial court explained in its order, the "first option to purchase" in paragraph 18B "does not provide a traditional right of first refusal." Thus, the trial court's subsequent application of right of first refusal principles to the language used in paragraph 18B to conclude that a seller can only have the intent to sell when there is a third party purchaser was error.

Although the language in paragraph 18B does not create a right of first refusal, it clearly was intended to create some precondition to its becoming operative. Other jurisdictions considering similar provisions have noted that they generally are intended to create "preemptive purchase rights," which give "the grantee the first opportunity to purchase the property if the landowner decides to sell." Bill Signs Trucking, LLC v. Signs Family Limited Partnership,

6

157 Cal. App. 4th 1515, 1522 (Ct. App. 2007). These preemptive purchase rights take "one of two forms, a right of first refusal or a right of first offer." Id. at 1523 (quotations omitted); see SKI, Ltd. v. Mountainside Properties, Inc., 114 A.3d 1169, 1174 (Vt. 2015); Kelly v. Ammex Tax and Duty Free Shops West, 256 P.3d 1255, 1258 (Wash. Ct. App. 2011). Although both forms "require, as a condition to the right being triggered, that the owner decide to sell," SKI, Ltd., 114 A.3d at 1175, they are distinct in that "[w]hile a right of first refusal is triggered when the owner receives an offer from a third party and decides to sell, a right of first offer is triggered when the owner decides to offer the property for sale without first receiving an offer from a third party," Constellation Development v. Western Trust, 882 N.W.2d 238, 243 (N.D. 2016). Thus, for a right of first offer, when the seller initially decides to sell the property, the seller must either allow the grantee to "make an offer for the purchase of the property before" the property is sold to a third party, John C. Murray, Options and Related Rights with Respect to Real Estate: An Update, 47 Real Prop. Tr. & Est. L.J. 63, 76 (2012), or directly "make an offer to the grantee of the right of first offer," Bill Signs Trucking, LLC, 157 Cal. App. 4th at 1523; see Murray, supra at 76 (noting that the grantee "can also protect himself by requiring that the owner . . . offer the property to him before the owner can offer the property to a third party"). Thereafter, "the landowner is free to sell the property to third parties." Kelly, 256 P.3d at 1258; see Murray, supra at 76. Although the trial court recognized these distinctions, it applied right of first refusal principles to conclude that an "intent to sell" only occurs when there is "an acceptable offer" from a third party. This conclusion was erroneous because, for a right of first offer, the triggering point is the decision to sell generally and not whether a third party has made an offer. SKI, Ltd., 114 A.3d at 1174-75; Constellation Development, 882 N.W.2d at 243.

It is evident from the language of the agreement that the parties intended paragraph 18B to be a right of first offer. The question that remains, however, is whether this provision simply required that the Keatings intend to sell the property, or that they intend to list the property for sale publicly. The defendants argue that pursuant to the plain language of paragraphs 18B and 18C, only the Keatings' intent to sell the Mink Island property by listing it for public sale triggers the Greenwalds' rights under paragraph 18B. The plaintiffs, however, assert that paragraph 18B requires only that the Keatings intend to sell the Mink Island property, and that the references to "re-list" or "listed" in paragraphs 18B and 18C merely describe the procedure by which sellers would typically demonstrate their intent to sell.

Given our general skepticism towards conditions precedent, Holden Eng'g and Surveying, 137 N.H. at 396, as well as our reluctance to construe contract provisions that grant one party discretion in performance in a manner so as to "deprive another party of a substantial proportion of the agreement's value," Centronics Corp. v. Genicom Corp., 132 N.H. 133, 143 (1989), we

conclude that both interpretations are plausible in light of all the circumstances, <u>Birch Broad.</u>, 161 N.H. at 196. On the one hand, the terms of paragraphs 18B and 18C could be read to mean that re-listing the Mink Island property for sale was simply the ministerial act by which the Keatings' intent to sell would be expressed. On the other hand, the provisions could be understood to impose a substantive limitation on the type of intent that the Keatings must have before the Greenwalds' right of first offer is triggered — not merely an intent to sell, but an intent to sell to the public by listing the property through MLS. The trial court never considered the former interpretation because it rejected outright the plaintiffs' position that the Keatings' intent to sell, without the need for an offer from a third party, triggered the plaintiffs' rights under paragraph 18B.

Because the meaning of the Agreement is ambiguous concerning whether listing the property was intended to be ministerial or substantive, the trial court erred in resolving this issue on summary judgment. Instead, remand is necessary for the court to consider the parties' intent in light of the totality of the circumstances surrounding the Agreement's creation. <u>See</u> <u>Behrens v. S.P. Constr. Co.</u>, 153 N.H. 498, 504 (2006) (noting that a trial court may consider parol evidence in interpreting ambiguous terms). Moreover, because the trial court's interpretation necessarily informed its decisions as to whether the Agreement was breached, and whether the plaintiffs were entitled to specific performance from the Uickers, we reverse those rulings as well.

Nor do we agree that paragraph 18B is otherwise unenforceable because it fails to include a purchase price. As explained above, paragraph 18B gives the plaintiffs a right of first offer — the right to "make an offer for purchase of the property before" it is sold to a third party. <u>See</u> Murray, <u>supra</u> at 76. To be valid, the law requires only that the Agreement contain all essential elements of a contract. <u>MS Real Estate v. Donald P. Fox Fam. Trust</u>, 864 N.W.2d 83, 91 (Wis. 2015) (quotation omitted). Like all contracts, an agreement containing a preemptive right must be supported by consideration or its equivalent, <u>Allison v. Agribank, FCB</u>, 949 S.W.2d 182, 188 (Mo. Ct. App. 1997), but it need not include the "ultimate sale price," <u>SKI Ltd.</u>, 114 A.3d at 1176. Thus, the court erred in concluding that paragraph 18B was unenforceable because it lacked an essential term.

Lastly, we agree with the plaintiffs that the trial court erred in summarily concluding that Barbara could not be held liable under the Agreement because she held no ownership interest in the Mink Island property and could not otherwise be chargeable as an agent of Jill. On this issue, the trial court ruled that even if Barbara was considered an agent of Jill, agents can only be held liable to third parties for their torts. But, as the plaintiffs point out, this is only part of the rules governing agent liability. Indeed, it is well settled that "[a]n agent purporting to act upon his own account, but in fact making a contract on

8

account of an undisclosed principal, is a party to the contract." <u>Restatement</u> <u>(Second) of Agency</u> § 322, at 72 (1958); <u>accord</u> <u>O'Connor v. Hancock</u>, 135 N.H. 251, 252 (1992). Perhaps recognizing this error, Barbara argues that she cannot be held liable because neither Jill nor Richard were held liable by the trial court. Given that we are reversing the trial court on its interpretation of the Agreement, it necessarily follows that this argument fails. Because we are reversing the trial court's ruling on this issue, we need not address the plaintiffs' argument that Barbara should be equitably estopped from disclaiming any interest in the property.

To the extent that this opinion does not address issues raised in the plaintiffs' notice of appeal that were not briefed, we deem them waived. <u>See</u> <u>Town of Londonderry v. Mesiti Dev.</u>, 168 N.H. 377, 379-80 (2015).

<u>Reversed and remanded</u>.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.